IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MIGUEL GARZA,

           Petitioner,                  No. CIV S-04-0625 GEB JFM P

      vs.

SCOTT KERNAN, Warden, et al.,

           Respondents.           FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding pro se with an application for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254.  By this action, petitioner challenges his 1999

conviction of 10 counts of second degree robbery, two counts of possession of a firearm by a

felon, and one count each of conspiracy to commit robbery and possession of a short-barreled

shotgun.  On some of those counts, the jury found petitioner personally used a firearm or was

armed with a firearm.  After the jury was discharged, the court found petitioner had eight prior

serious felony convictions and served a prior prison term.  Petitioner was sentenced under the

three strikes law to an aggregate state prison term of 330 years to life.  Petitioner claims (a) the

prosecutor's peremptory strike of an African-American woman from the jury panel was based on

race in violation of Batson v. Kentucky, 467 U.S. 79 (1986); (b) ineffective assistance of trial

counsel; and (c) his sentence under California's Three Strikes law violated his right to due

process and equal protection.

1

1    After review of the record in this action, including the lodged records of the state

2    court, this court has determined that the petition for writ of habeas corpus should be denied.

3    I.  Procedural Background

4    Petitioner appealed his conviction to the California Court of Appeal, Third

5    Appellate District, and on June 22, 2001, that court affirmed the judgment.  (Lodged Document,

6    Ex. C, attachment 1.)  Petitioner filed a petition for review in the California Supreme Court.  (Id.,

7    Ex. C.)  On September 12, 2001, the Supreme Court denied the petition for review.    (Id., Ex.

8    D.)

9    On May 9, 2002, petitioner filed a petition for writ of habeas corpus in the San

10   Joaquin County Superior Court.  (Lodged Document, Ex. E.)  That petition was denied on July 8,

11   2002.  (First Amended Petition at 279-81.)

12   On September 27, 2002, petitioner filed a second petition for writ of habeas

13   corpus.  (Lodged Document G.)  That petition was denied on October 29, 200.  (First Amended

14   Petition at 283-84.)

15   On February 7, 2003, petitioner filed a third petition for writ of habeas corpus in

16   the Superior Court.  (Resp.'s Motion to Dismiss, Ex. C.)  That petition was denied on March 17,

17   2003.  (First Amended Petition at 291-95.)

18   On April 22, 2003, petitioner filed a petition for writ of habeas corpus in the Court

19   of Appeal.  (Resp.'s Motion to Dismiss, Ex. F.)  That petition was denied on April 24, 2003.

20   (First Amended Petition at 297.)

21   On June 13, 2003, petitioner filed his first petition for writ of habeas corpus in the

22   California Supreme Court.  (Resp.'s Motion to Dismiss, Ex. H.)  The petition was denied on

23   February 18, 2004 with citation to In re Swain, 34 Cal.2d 300, 304 (1949).  (First Amended

24   Petition, at 299.)

25   /////

26   /////

1   On March 29, 2004, petitioner filed the instant action.  On December 15, 2004,

2   the initial petition was dismissed and the instant action was stayed pending exhaustion of

3   petitioner's state court remedies.  (Docket No. 19.)

4   On April 26, 2005, petitioner filed his second petition for writ of habeas corpus in

5   the California Supreme Court.  (Lodge Document C.)  On April 12, 2006, the petition was denied

6   with citation to In re Clark, 5 Cal.4th 750 (1993) and In re Robbins, 18 Cal.4th 770, 780 (1998).

7   (First Amended Petition at 301.)

8   On May 11, 2006, petitioner filed his first amended petition in the instant action.

9   (Docket No. 20.)  On July 5, 2006, respondent filed its answer.  (Docket No. 22.)  On August 7,

10  2006, petitioner filed a traverse.  (Docket No. 24.)

11  II.  Factual Background[1]

12  On December 28, 1998, [petitioner] and his nephews, Manuel and
    Herman Garza, robbed an AM-PM store at the intersection of
13  California and Alpine Streets in Stockton using a 12-gauge
    shotgun.  Later that day, the three robbed another AM-PM on West
14  Lane in Stockton, again using the shotgun.

15  On January 1, 1999, [petitioner] and his nephews robbed a Taco
    Bell restaurant using two sawed-off shotguns and a knife.  Later,
16  they robbed a McDonald's restaurant and a Circle K store, again,
    using the shotguns.

17
    On January 5, 1999, [petitioner] and his nephews robbed a Pizza
18  Hut restaurant in Tracy using two sawed-off shotguns.  Later,
    [petitioner] and his nephews drove to a Shell Food Mart in
19  Stockton where the nephews went inside and robbed the store
    using the shotguns.
20
    On January 8, 1999, [petitioner] and his nephews robbed a
21  Kentucky Fried Chicken restaurant. [Petitioner's] nephews were
    armed with sawed-off shotguns.  During the robbery, [petitioner]
22  stole a ring from a restaurant employee.  Later that day, [petitioner]
    and his nephews robbed Michael's Pizza on the corner of Alpine
23  and Delaware Streets in Stockton. [Petitioner's] nephews again
    carried the shotguns.
24

25      [1]  The following summary is drawn from the June 22, 2001 opinion by the California
    Court of Appeal, Third Appellate District, in People v. Garza, C034349, at 2-30, Lodged
26  Documents, Ex. C, attachment 1 (hereafter "slip op.").

1
2
> On January 12, 1999, police officers arrested [petitioner] and seized two sawed-off shotguns.

3    People v. Garza, slip op. at 2-3.

4    III.  General Standards

5           Federal habeas corpus relief is not available for any claim decided on the merits in

6    state court proceedings unless the state court's adjudication of the claim:

7
8
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

9
10
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

11   28 U.S.C. § 2254(d).

12          Under section 2254(d)(1), a state court decision is "contrary to" clearly

13   established United States Supreme Court precedents "if it 'applies a rule that contradicts the

14   governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are

15   materially indistinguishable from a decision'" of the  Supreme Court and nevertheless arrives at

16   different result.  Early v. Packer, 573 U.S. 3, 8 (2002) (quoting Williams v. Taylor, 529 U.S. 362,

17   405-406 (2000)).

18          Under the  "unreasonable application" clause of section 2254(d)(1), a federal

19   habeas court may grant the writ if the state court identifies the correct governing legal principle

20   from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

21   prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

22   simply because that court concludes in its independent judgment that the relevant state-court

23   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

24   application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

25   (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

26   question, is left with a 'firm conviction' that the state court was 'erroneous.'")

1    The court looks to the last reasoned state court decision as the basis for the state

2    court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state

3    court reaches a decision on the merits but provides no reasoning to support its conclusion, a

4    federal habeas court independently reviews the record to determine whether habeas corpus relief

5    is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

6    Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not

7    reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

8    AEDPA's deferential standard does not apply and a federal habeas court must review the claim

9    de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160,

10   1167 (9th Cir. 2002).

11   IV.  Petitioner's Claims

12        A.  Batson Claim

13        Petitioner claims his Sixth Amendment rights were violated by the trial court's

14   denial of his Wheeler motion.[2]  The California Court of Appeal addressed this claim as follows:

15           [Petitioner] contends he was denied the right to a representative
             jury.  *People v Wheeler, supra,* 22 Cal.3d 258 holds that
16           peremptory challenges may not be used to exclude individuals
             from a jury merely because they are members of a cognizable
17           group differentiated by race, religion, ethnicity or similar grounds.
             "[T]he use of peremptory challenges to remove prospective jurors
18           on the sole ground of group bias violates the right to trial by a jury
             drawn from a representative cross-section of the community under

19

20        [2]   In People v. Wheeler, 22 Cal. 3d 258 (1978), the California Supreme Court held that
     peremptory challenges may not be used to exclude from a jury all or most members of a
21   cognizable group solely on the ground of presumed "group bias."  Wheeler was the "California
     analogue to Batson v. Kentucky[, 476 U.S. (1986)]."  Lewis v. Lewis, 321 F.3d 824, 827 & n.5
22   (9th Cir. 2003).  Wheeler differs from Batson in placing a more onerous burden of proof on
     petitioner in establishing a prima facie case of discrimination ("strong likelihood" vs. "raise an
23   inference").  See Cooperwood v. Cambra, 245 F.3d 1042, 1046-47 (9th Cir. 2001); Wade v.
     Terhune, 202 F.3d 1190, 1192 (9th Cir 2000) ("We hold that the *Wheeler* standard, as currently
24   interpreted by the California courts, does not satisfy the constitutional requirement laid down in
     Batson.").  This view was upheld by the United States Supreme Court in Johnson v. California,
25   545 U.S. 162 (2005).  Here, however, because the state trial court found petitioner had made a
     *prima facie* showing of discrimination, the Batson/Wheeler distinction does not make a
26   difference.

5

article I, section 16, of the California Constitution." (*Id.* at pp. 276-277.)  This same right is guaranteed under the federal Constitution.  (*Batson v. Kentucky* (1986) 476 U.S. 79, 84-89 [90 L.Ed.2d 69, 79-83].)

Under *Wheeler*, a party believing his opponent has used peremptory challenges for a discriminatory purpose must raise a timely challenge and establish a prima facie case of such discrimination to the satisfaction of the court.  (*People v. Snow* (1987) 44 Cal.3d 216, 222.)  The burden then shifts to the opposing party to present an explanation for each challenge based on individual factors unrelated to group bias.  (*People v. Ayala* (2000) 24 Cal.4th 243, 260.)  In the final step, the trial court must determine if the defendant has carried his burden of proving purposeful discrimination.  In so doing, the court must evaluate the explanations given to determine if they are sham excuses contrived to forestall a claim of discrimination.  (*People v. Snow, supra,* 44 Cal.3d at p. 222.)

The first two African-Americans seated in the jury box, Ms. E. and Mr. B., were peremptorily excused by the prosecution.  The following day, [petitioner] made a *Wheeler* motion, claiming purposeful exclusion of African-Americans.  The court found a prima facie case and required the prosecutor to articulate nondiscriminatory reasons for the peremptory challenges. Regarding Ms. E., the prosecutor stated: "[M]y investigating officer walked into the courtroom and immediately recognized Miss E[.] as a person that he had actually arrested before and arrested her daughter and he said, 'Miss Ellison is staring straight at me.  The whole E[.] family hates me.'"  As to Mr. B., the prosecutor explained:  "Mr. B[.] I asked him specifically if he lived in Hayward before and he told me that he did.  I've lived in Hayward before and [in] my personal experience people from Hayward are some of the oddest, most unreasonable people I lived next to and I moved out of there in a year."  The prosecutor further explained:  "Also, he was slouching in his chair, did not appear to answer my questions directly or look directly at me when I was asking him questions."  Later, the prosecutor elaborated:  "I specifically asked him do you work at Kaiser in Hayward?  He said yes.  I said where is the Kaiser Hospital in Hayward?  He told me it was on Hatchberry Street.  I don't remember that one being there. Have you lived there before?  Yes, I've lived in Hayward before. He's a storekeeper at Kaiser.  His wife is an accountant.  Has a 19-year-old and a nine-year-old.  He lives in Tracy now.  He's [never][3] been involved in a lawsuit and he's never been a juror."

---

[3]  Mr. B., also known as Mr. Bautiste, stated he had never been in a lawsuit.  (Aug. RT 249.)  [NB: Mr. Bautiste is also spelled "Mr. Batiste," but the "Bautiste" spelling is taken from the Reporter's Transcript.]

The trial court eventually denied the *Wheeler* motion, finding no discriminatory motive.  Regarding Mr. B., the court explained that, while one may not agree with the logic of the prosecutor's justification, it was nevertheless race neutral.  The court indicated it was aware of no others from Hayward having been left on the panel.

[Petitioner] contends the prosecutor's justifications for excusing Mr. B. were a sham.[4]  He argues Mr. B. answered all questions posed directly and appropriately and the City of Hayward had no "nexus" to the crimes charged.  The People counter that the trial court made a "'sincere and reasoned effort'" to evaluate the prosecutor's stated justification and, therefore, its conclusions are entitled to deference.

There is no question the prosecutor's stated justification for excusing Mr. B. -- his prior residence in Hayward – is race neutral.[5]  There is no claim, for example, that a disproportionate number of African-Americans reside in Hayward.  There is also no question that Mr. B. previously resided in Hayward.  He so stated, and further indicated he still worked in Hayward.  The issue here is whether the prosecutor's stated bias against people from Hayward was contrived to mask an impermissible motive.

"'The party seeking to justify a suspect excusal need only offer a genuine, reasonably specific, race- or group-neutral explanation related to the particular case being tried.  [Citations.]  The justification need not support a challenge for cause, and even a "trivial" reason, if genuine and neutral, will suffice.'"  (*People v. Ervin* (2000) 22 Cal.4th 48, 74-75.)  "Jurors may be excused based on 'hunches' and even 'arbitrary' exclusion is permissible, so long as the reasons are not based on impermissible group bias."  (*People v. Turner* (1994) 8 Cal.4th 137, 165.)

It is only at the third step of the *Wheeler* analysis that the plausibility of the stated justification is tested.  "At that stage, implausible or fantastic justification may (and probably will) be found to be pretexts for purposeful discrimination.  But to say that a trial judge *may choose to disbelieve* a silly or superstitious reason at step three is quite different from saying that a trial judge *must terminate* the inquiry at step two when the race-neutral reason is silly or superstitious."  (*Purkett v. Elem* (1995) 514 U.S. 765, 768 [131 L.Ed.2d 834, 839], italics original.)

---

[4]  [Petitioner] does not contest the race-neutral basis for challenging Ms. E.

[5]  Although the prosecutor also mentioned Mr. B. was slouching in his chair and did not appear to answer questions directly or look at the prosecutor, the trial court did not base its rejection of [petitioner's] *Wheeler* challenge on these factors.

"When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings.  But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons are sufficient."  (*People v. Silva* (2001) 25 Cal.4th 345, 386.)

The prosecutor's stated reasons for excusing Mr. B. were only partially supported by the record – Mr. B. did not say the Kaiser Hospital in Hayward was on "Hatchberry" Street.  And the prosecutor's stated reason for the challenge – that based on his personal experience people from Hayward were "odd[]" and "unreasonable" -- was itself odd.  Even if [the court] were to characterize the reason as inherently implausible though, the trial court did more than make a global finding that the prosecutor's reasons were sufficient.

[The court notes] that the third step of the analysis turns primarily on an assessment of credibility.  (*Purkett v. Elem, supra,* 514 U.S. at p. 769 [131 L.Ed. 2d at p. 840].)  As long as the trial court has made a "'sincere and reasoned effort'" to evaluate the nondiscriminatory justifications given by the prosecution, its conclusions are entitled to deference on appeal.  (*People v. Ervin*, supra, 22 Cal.4th at p. 75.)

In this instance, the defense argued the Hayward justification was a sham.  Although the court initially appeared to be confused about the nature of [petitioner's] argument, explaining that residents of Hayward are not a cognizable group for *Wheeler* purposes, defense counsel focused the court on the issue presented.  The court then indicated that, while defense counsel may not agree with the prosecutor's rationale, "attorneys obviously make – use irrational things sometimes for picking a jury, things that may not be rational to other people."  The court continued:  "I don't know of anybody else on the jury that has been left on that is from Hayward.  I can't think of anybody else that said they were from Hayward that the D.A. has passed over."  When defense counsel argued the court had a duty to determine if the prosecution's stated reason was legitimate, the court responded:  "I think it is the Court's duty to determine whether or not the reasons given are a pretext and if I could remember that – anybody else that's on this jury that the People have not kicked had some connection with Hayward, I might well find that there – it was a pretext, but I can't think of anybody like that.  So I'm going to accept the prosecutor's representations that he has a thing against people from Hayward."

While [petitioner] may not agree with the court's conclusions, the fact remains the court made a sincere and reasoned effort to evaluate the prosecutor's Hayward rationale.  The court's conclusion that the stated justification was not a pretext is therefore

> entitled to deference.  Although we might consider the prosecutor's
> rationale unusual, it is not so inherently improbable as to overcome
> the deference due the trial judge, who was present to evaluate the
> prosecutor's credibility and sincerity.

People v. Garza, slip op. at 3-9.

Petitioner argues that the prosecutor's explanation was a sham and that the trial court's evaluation is not entitled to deference because the appropriate legal standard was not properly addressed.[6]  In his traverse, petitioner contends the Hayward excuse is implausible and fantastic, is a pretext for discrimination, and should be granted, citing Purkett, supra.

Respondent contends that the state court's factual finding of credibility is correct because petitioner has failed to proffer "clear and convincing" evidence to the contrary.  28 U.S.C. § 2254(e)(1).  Respondent argues that while reasonable minds might disagree about the prosecutor's credibility, that is insufficient on habeas review to overrule the state court's credibility determination.  Rice v. Collins, 546 U.S. 333, 126 S.Ct. at 976.  Respondent contends the state court properly applied Batson, supra.

Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution. See Batson v. Kentucky, 476 U.S. (1986); Johnson v. California, 545 U.S. 162 (2005).  So-called Batson claims are evaluated pursuant to a three-step test:

> First, the trial court must determine whether [petitioner] has made
> a prima facie showing that the prosecutor exercised a peremptory
> challenge on the basis of race.  Second, if the showing is made, the

---

[6]  In his traverse, petitioner argues, for the first time, that the court must take into consideration all of the Wheeler motions defense counsel made, in particular, the motions challenging the dismissal of Hispanic jurors from the venire.  Petitioner claims this establishes a pattern of discrimination under Batson.  However, a traverse is not the proper pleading to raise additional grounds for relief.  See Cacoperdo v. Demosthenes, 37 F.3d 504, 507-08 (9th Cir.1995).  In general, claims not raised in the petition are not cognizable on appeal.  See United States v. Allen, 157 F.3d 661, 667 (9th Cir.1998) (citing Cacoperdo, 37 F.3d at 507).  Although the prosecution also used peremptory challenges to remove Hispanic jurors from the venire, he also passed for challenge at least three Hispanic jurors who remained on the jury.  (RT 254.)  The trial judge found no prima facie showing of discrimination had been made.  (RT 256.)

> burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. . . .  Third, the court must then determine whether [petitioner] has carried his burden of proving purposeful discrimination.

Rice v. Collins, 546 U.S. 333, 126 S.Ct. 969, 973-74 (2006), citing Batson, 476 U.S. at 98.

This court is also required to use a deferential standard when reviewing a habeas petition's claims that were previously adjudicated by a state court on the merits.  28 U.S.C. § 2254(d).  Under those circumstances, a district court only grants a habeas petition where the decision of the state court was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

### i. Prima Facie Case

Petitioner must show that "he is a member of a cognizable racial group," Batson, 476 U.S. at 96, and that the circumstances and facts raise an inference that the prosecution has excluded potential jurors based on their race.  Here, petitioner is Hispanic and Mr. Bautiste is African-American, members of cognizable racial groups.  There were only two African-Americans on the jury venire.  Mr. Bautiste was the second African-American on the jury panel when the prosecutor exercised the peremptory challenge; Ms. E., also African-American, was previously excused by peremptory challenge.[7]  The fact that all blacks in the venire pool were struck raises an inference of discrimination, McClain, 217 F.3d at 1224, and the state trial court here found petitioner made a prima facie showing of discrimination.

### ii. Race-Neutral Reasons

Next, the burden shifts to the prosecution to articulate a race-neutral explanation for the exercise of the peremptory challenge to Mr. Bautiste.  See Batson, 476 U.S. at 97.  "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror."  Hernandez v. New York, 500 U.S. 352, 360 (1991) (plurality

---

[7]  Petitioner does not challenge the dismissal of Ms. E because counsel had a legitimate, race-neutral reason for dismissing her.

1   opinion)).  "At this step of the inquiry, the issue is the facial validity of the prosecutor's

2   explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason

3   offered will be deemed race-neutral."  Stubbs v. Gomez, 189 F.3d 1099, 1105 (1999) (quoting

4   Hernandez, 500 U.S. at 360.)

5           As noted above, the prosecution gave three separate reasons why he exercised his

6   peremptory challenge as to Mr. Bautiste:  he had lived in and currently worked in Hayward.  The

7   prosecutor previously lived in Hayward and found people from Hayward to be "odd" and "most

8   unreasonable."  Also, Mr. Bautiste was slouching in his chair, did not appear to answer questions

9   directly or look directly at the prosecution when questioned.  Mr. Bautiste told the prosecutor that

10   he worked at Kaiser in Hayward, which was on Hatchberry Street.  These reasons, on their face,

11   are race-neutral and thus meet the second step of the Batson analysis.[8]

12           iii.  Evidence of Purposeful Discrimination

13           It is at the third step of the three-step inquiry that the court reaches the "real meat"

14   of a Batson challenge.  Lewis, 321 F.3d at 830.  It is at this step that "the trial court must

15   determine whether the defendant has carried his burden of proving purposeful discrimination."

16   McClain, 217 F.3d at 1220 (quoting Hernandez, 500 U.S. at 359).  See also Batson, 476 U.S. at

17   98.  Thus, the trial court must evaluate the prosecutor's proffered reasons and make a credibility

18   determination.  Lewis, 321 F.3d at 830; McClain, 217 F.3d at 1220.  As with any credibility

19   determination, the trial court's own observations are of significant importance.  Batson, 476 U.S.

20   at 98, n.21; Lewis, 321 F.3d at 830.  It has also been observed that:

21                Other factors come into play in a court's evaluation of a
                 prosecutor's reasons as well, however. For example, if a review of

22                 the record undermines the prosecutor's stated reasons, or many of
                 the proffered reasons, the reasons may be deemed a pretext for

23                 racial discrimination. Similarly, a comparative analysis of the

24

25        [8]  As noted by the state appellate court, the trial court properly followed the reasoning of
   Purkett and, when faced with an irrational reason for challenging Mr. Bautiste, continued on to

26   the third prong of the analysis  to evaluate the nondiscriminatory justifications given by the
   prosecution.

struck juror with empaneled jurors "is a well-established tool for
exploring the possibility that facially race-neutral reasons are a
pretext for discrimination." [citation omitted.]  After analyzing
each of the prosecutor's proffered reasons, our precedent suggests
that the court should then step back and evaluate all of the reasons
together. The proffer of various faulty reasons and only one or two
otherwise adequate reasons, may undermine the prosecutor's
credibility to such an extent that a court should sustain a *Batson*
challenge.  [citation omitted.]

Lewis, 321 F.3d at 830-31.  See also Miller-El v. Dretke, 545 U.S. 231 (2005) (utilizing

comparative analysis, in a case in which a prima facie showing had been made, to determine

whether the prosecutor had been motived by racial bias in exercising peremptory challenges).[9]

On the other hand, the fact that a prosecutor's reasons may be "founded on

nothing more than a trial lawyer's instincts about a prospective juror" does not "diminish the

scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons

for the prosecutor's actions."  Power, 881 F.2d at 740 (quoting United States v. Chinchilla, 874

F.2d 695, 699 (9th Cir. 1989)).  "Excluding jurors because of their profession, or because they

acquitted in a prior case, or because of a poor attitude in answer to voir dire questions is wholly

within the prosecutor's prerogative."  United States v. Thompson, 827 F.2d 1254, 1260 (9th Cir.

1987).  Rather, "[e]vidence in the record of objective reasons to strike a juror implies that racial

bias did not motivate the prosecutor."  Boyd v. Newland, 393 F.3d 1008, 1013 (9th Cir. 2004).

See also Paulino v. Castro, 371 F.3d 1083, 1091-92 (9th Cir. 2004) ("While we may consider

whether the record contains entirely plausible reasons, independent of race, why a prosecutor

may have exercised peremptories, such reasons have usually helped persuade us that defendant

made no prima facie showing where defendant challenged the excusal of just one juror.")

/////

---

[9]  Comparative juror analysis refers to "an examination of a prosecutor's questions to
prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise
similar jurors differently because of their membership in a particular group."  *Boyd*, 2006 WL
3026021 at *5.  *See also Miller-El*, 125 S.Ct. at 2325 (stating that "side-by-side comparisons of
some black venire panelists who were struck and white panelists allowed to serve" was "more
powerful" than bare statistics).

1    However, "implausible or fantastic justifications may (and probably will) be found

2    to be pretexts for purposeful discrimination." Purkett, 514 U.S. at 768.  See also Lewis v. Lewis,

3    321 F.3d 824, 830 (9th Cir. 2003) ("[I]f a review of the record undermines the prosecutor's stated

4    reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial

5    discrimination.")  In step three, the court "considers all the evidence to determine whether the

6    actual reason for the strike violated [petitioner's] equal protection rights." Yee v. Duncan, 463

7    F.3d 893, 899 (9th Cir. 2006).  "A court need not find all nonracial reasons pretextual in order to

8    find racial discrimination." Kesser v. Cambra, 465 F.3d 351, 360 (9th Cir. 2006) (en banc).

9    Petitioner bears the burden of persuasion to prove the existence of unlawful

10   discrimination. Batson, 476 U.S. at 93.  "This burden of persuasion 'rests with, and never shifts

11   from, the opponent of the strike.'" Id. at 2417 (quoting Purkett, 514 U.S. at 768.  However,

12   petitioner "is entitled to rely on the fact, as to which there can be no dispute, that peremptory

13   challenges constitute a jury selection practice that permits 'those to discriminate who are of a

14   mind to discriminate.'" Batson, 476 U.S. at 96 (quoting Avery v. Georgia, 345 U.S. 559, 562

15   (1953).

16   "Under AEDPA, however, a federal habeas court must find the state-court

17   conclusion 'an unreasonable determination of the facts in light of the evidence presented in the

18   State court proceeding." Rice, 126 S.Ct. at 974, quoting 28 U.S.C. § 2254(d)(2).  "[A] federal

19   habeas court can only grant [habeas relief] if it was unreasonable to credit the prosecutor's race-

20   neutral explanations for the Batson challenge." Rice, 126 S.Ct. at 974.  In determining whether a

21   state court's application of law or factual determination is "unreasonable," the court cannot

22   simply consider whether it would have reached a different outcome on the same record. Rice,

23   126 S.Ct. at 974 (stating that "[r]easonable minds reviewing the record might disagree about" the

24   ultimate issue is insufficient for habeas relief).  "The 'unreasonable application' clause requires

25   /////

26   /////

13

1  the state court decision to be more than incorrect or erroneous." <u>Lockyer v. Andrade</u>, 538 U.S.

2  63, 75 (2003).  Only if the evidence is "too powerful to conclude anything but" the contrary

3  should the district court grant relief.  <u>Miller-El v. Dretke</u>, 545 U.S. 231, 265 (2005).

4     Here, Mr. Bautiste informed the court that he lived in Tracy.  (ART at 249.)  The

5  prosecutor asked Mr. Bautiste whether he had always lived in Tracy, and the response was no.

6  (ART at 266.)  The prosecutor asked him where he lived before Tracy, and Mr. Bautiste

7  responded, "Hayward."  (<u>Id</u>.)

8     Review of the voir dire revealed that each prospective juror was asked to inform

9  the court where the juror resided.  (Augment of Reporter's Transcript on Appeal ("ART"),

10  *passim*.)[10]  None of the seated jurors or alternates were from Hayward.  (ART 72, 88, 91, 95, 96,

11  98, 100, 101, 102, 158, 181, 247, 333, 418, 419, 420, 421.)  The voir dire also demonstrates that

12  the prosecutor asked many of the jurors whether they had always lived there and, if not, where

13  they lived before.  (ART 124-25, 130, 268, 321, 437.)  This comparative analysis supports the

14  prosecutor's focus on where potential jurors were from, and confirms that no juror from Hayward

15  was seated.

16     On the other hand, the prosecutor's bias against "everyone from Hayward" is

17  irrational.  While it is not overtly racial, in that Hayward does not have a reputation as having a

18  particularly high population of any one race, it is such an unusual bias, and covers such a large

19  area, that it could serve as a pretext for a discriminatory motive.  However, this excuse does not

20  seem implausible on its face given the prosecutor's testimony that he had lived in Hayward and

21  personally experienced people he found to be "odd" and "unreasonable."  Moreover, it is not

22  such an outrageous excuse as to be deemed fantastic, bizarre or imaginary or not grounded in

23  reality.

24  /////

25

26    [10]  Voir dire took place on September 29, 30, and October 1, 1999.  (<u>Id</u>.)

1      As noted by the state court, the record fails to support the prosecutor's third

2  reason, that Mr. Bautiste had testified that Kaiser was on Hatchberry Street, and the prosecutor

3  didn't "remember that one being there."  (RT at 262.)  Mr. Bautiste testified that Kaiser was

4  located on Hesperian and Tilson Streets in Hayward.  The location of Mr. Bautiste's workplace

5  bore no relevance to this case or to Mr. Bautiste's ability to serve as a juror.

6      The record also does not support the prosecutor's claim that Mr. Bautiste did not

7  appear to answer the prosecutor's questions directly.  In addition to the two questions set forth

8  above, the prosecutor asked the following:

9          MR. VILLAPUDUA:  Mr. Bautiste?  [question re parking tickets]

10         PROSPECTIVE JUROR BAUTISTE:  No.

11  (ART at 268.)

12         MR. VILLAPUDUA:  What city do you live in?  You live in
           Tracy.  Where do you work?
13
           PROSPECTIVE JUROR BAUTISTE:  Oh, Hayward.
14
           MR. VILLAPUDUA:  You work in Hayward?  There's a Kaiser
15         Center in Hayward?

16         PROSPECTIVE JUROR BAUTISTE:  Yeah, Kaiser Hospital.

17         MR. VILLAPUDUA:   What street is that on?

18         PROSPECTIVE JUROR BAUTISTE:  It's on Hesperian and Tilson.

19         MR. VILLAPUDUA:  I lived in Hayward.

20  (ART at 269.)  In total, the prosecutor posed six questions to Mr. Bautiste on voir dire, each of

21  which was answered directly by Mr. Bautiste.  This limited voir dire supports the view that the

22  "Hayward bias" was a pretext.  The prosecutor failed to ask Mr. Bautiste any questions designed

23  to demonstrate or clarify whether Mr. Bautiste was "odd" or "unreasonable."  Ali v. Hickman,

24  ___ F.3d ____, 2009 WL 1924792 (9th Cir. 2009), citing See Kesser, 465 F.3d at 364 ("We

25  expect the prosecutor would have cleared up any misunderstanding by asking further questions

26  before getting to the point of exercising a strike." (quoting Miller-El, 545 U.S. at 244).)

15

1    Thus, factually, this case presents a close question as to whether petitioner met his

2   burden under the third prong of Batson.  Here, however, the question is whether the state court's

3   finding that the stated justification was not a pretext was "an unreasonable determination of the

4   facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(2).

5   The state court deferred to the state trial judge's decision because the trial judge evaluated the

6   prosecutor's credibility and sincerity.  While the undersigned might have reached a different

7   conclusion here, that is not the issue.  This court may not substitute its evaluation of the record

8   for that of the state court.  See Rice, 126 S.Ct. at 973-76.  The state court's opinion here was not

9   unreasonable, and the state court appropriately evaluated the prosecutor's reason and the

10   comparative analysis supports his reason.

11    After reviewing the record, including the voir dire transcript for comparative

12   analysis, the undersigned finds that the state court's disposition of this claim was not contrary to

13   or an unreasonable application of clearly established federal law nor did it result in a decision

14   that was based on an unreasonable determination of the facts in light of the evidence presented in

15   the state court proceeding.  The conclusion of the state appellate court that it should defer to the

16   trial judge's credibility determination is supported by the record and recent Supreme Court

17   authority.  Rice, 126 S.Ct. 974.  Nothing in the record suggested the trial court failed to conduct a

18   searching inquiry of the prosecutor's reason for striking Mr. Bautiste.  So too is the state appellate

19   court's determination that the prosecutor did not exercise a peremptory challenge to Mr. Bautiste

20   based on membership in a particular group.  The prosecutor expressed neutral bases for the use of

21   the peremptory challenge of Mr. Bautiste.  See Power, 881 F.2d at 740.  His reasons were "clear

22   and reasonably specific."  Purkett, 514 U.S. at 768-69.  See also Mitleider v. Hall, 391 F.3d 1039,

23   1049 (9th Cir. 2004) ("We have reviewed the record and Mitleider's presentation and conclude

24   /////

25   /////

26   /////

16

1    that he has not demonstrated that it was unreasonable for the trial judge to find the prosecutor

2    credible.")[11]

3           The state court's rejection of petitioner's first claim for relief was neither contrary

4    to, nor an unreasonable application of, controlling principles of United States Supreme Court

5    precedent.  Petitioner's first claim for relief should be denied.

6           B.  Procedural Default

7           Respondent contends petitioner's remaining claims are barred by procedural

8    default.

9           As the United States Supreme Court has explained, in all cases in which a state

10   prisoner has defaulted his federal claim in state court pursuant to an independent and adequate

11   state procedural rule, federal habeas review of the claim is barred unless the prisoner can

12   demonstrate cause for the default and actual prejudice as a result of the alleged violation of

13   federal law, or demonstrate that failure to consider the claims will result in a fundamental

14   miscarriage of justice.  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  The state rule is only

15   "adequate" if it is "firmly established and regularly followed."  Id.  (quoting Ford v. Georgia, 498

16   U.S. 411, 424 (1991)); Bennett v. Calderon, 322 F.3d 573, 583 (9th Cir. 2003) ("[t]o be deemed

17   adequate, the state law ground for decision must be well-established and consistently applied").

18   The state rule must also be "independent" in that it is not "interwoven with the federal law."

19   Park v. California, 202 F.3d 1146, 1152 (9th Cir. ), cert. denied, 531 U. S. 918 (2000) (quoting

20   Michigan v. Long, 463 U.S. 1032, 1040-41 (1983).  Even if the state rule is independent and

21   adequate, the claims may be heard if the petitioner can show: (1) cause for the default and actual

22   prejudice as a result of the alleged violation of federal law; or (2) that failure to consider the

23   claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 749-50.

24   /////

25

26       [11]  The only two African-American potential jurors were questioned and excused by the prosecution via peremptory challenges.

1    Although the question of procedural default "should ordinarily be considered

2    first," a reviewing court need not do so "invariably," especially when it turns on difficult

3    questions of state law.  Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997); see also Busby v.

4    Dretke, 359 F.3d 708, 720 (5th Cir. 2004).  In order to determine whether petitioner's claims

5    were subject to a state procedural bar, this court would have to decide, among other things, which

6    state procedural rule(s), if any, bar which particular claim, if any, when the state procedural

7    rule(s) became firmly entrenched, and whether the rule(s) have been consistently and regularly

8    applied.  In this case, this court finds that petitioner's claims can be resolved more easily by

9    addressing them on the merits.  Accordingly, this court will assume that petitioner's claims are

10   not defaulted and will address them on the merits.

11                    C.  Ineffective Assistance of Trial Counsel

12                    Petitioner claims that his trial counsel rendered ineffective assistance when he

13   failed to challenge the jurisdiction of arresting officers and the San Joaquin County Superior

14   Court; failed to properly advise petitioner regarding plea bargain offers; failed to object to

15   charges and convictions of conspiracy to commit robbery; failed to request an instruction that

16   Roger Mungle was an accessory after the fact; failed to adequately argue the motion to suppress,

17   and failed to adequately proffer evidence of petitioner's limp.  After setting forth the appropriate

18   standards, the court will address each claim seriatim.

19                    The Sixth Amendment guarantees the effective assistance of counsel.  The United

20   States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

21   Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

22   counsel, a petitioner must first show that, considering all the circumstances, counsel's

23   performance fell below an objective standard of reasonableness.  Id. at 687-88.  After a petitioner

24   identifies the acts or omissions that are alleged not to have been the result of reasonable

25   professional judgment, the court must determine whether, in light of all the circumstances, the

26   identified acts or omissions were outside the wide range of professionally competent assistance.

18

1    Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Second, a petitioner must establish that

2    he was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 693-94.  Prejudice

3    is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

4    result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a

5    probability sufficient to undermine confidence in the outcome."  Id.  See also Williams, 529 U.S.

6    at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).

7              i. Jurisdiction

8              Petitioner contends defense counsel failed to challenge the jurisdiction of arresting

9    officers and the San Joaquin County Superior Court, and appellate counsel failed to challenge

10   jurisdiction on appeal.

11             As noted by respondent, the peace officers who executed the arrest and detention

12   of petitioner had authority anywhere in the state, including Modesto, as to the robberies under

13   Cal. Penal Code § 830.1.[12]  The San Joaquin County Superior Court had jurisdiction over the

14   criminal charges under California Penal Code §§ 777, 781 and 783,[13] because all of the crimes

15

16        [12]  Section 830.1 provides, in pertinent part:
           (a) Any . . . deputy sheriff, employed in that capacity, of a county, . . . any police officer,
     employed in that capacity and appointed by the chief of police . . . of a city, . . . is a peace officer.
17   The authority of these peace officers extends to any place in the state, as follows:

18             (1) As to any public offense committed or which there is probable cause to believe
     has been committed within the political subdivision that employs the peace officer or in which
     the peace officer serves.
19   Id.

20        [13]  These Code Sections provide as follows:
           Every person is liable to punishment by the laws of this State, for a public offense
21         committed by him therein, except where it is by law cognizable exclusively in the
           courts of the United States; and except as otherwise provided by law the
22         jurisdiction of every public offense is in any competent court within the
           jurisdictional territory of which it is committed.
23   Cal. Penal Code § 777.
           When a public offense is committed in part in one jurisdictional territory and in
24         part in another, or the acts or effects thereof constituting or requisite to the
           consummation of the offense occur in two or more jurisdictional territories, the
25         jurisdiction of such offense is in any competent court within either jurisdictional
           territory.
26   Cal. Penal Code § 781.

were committed in San Joaquin County.  (CT 320-40.)  In addition, there was evidence that

petitioner possessed the shotguns in his vehicle while driving in Stockton (San Joaquin County)

before he drove to Modesto where the shotguns were seized, to establish that petitioner was a

felon in possession of a firearm and a deadly weapon.  (CT 66-67, 90-91, 106-07, 109-10.)  Thus,

the San Joaquin County Court had jurisdiction to try petitioner for all of the charges raised

against him.

           Moreover, defense counsel filed a motion to suppress evidence obtained upon

petitioner's arrest, which was denied.  (RT 149.)  The state court found petitioner

> was on parole, had a condition of his parole to agree to search or
> seizure by a parole officer or any other peace officer, any time of
> the day or night, with or without warrant, and with or without
> cause.

(RT 149.)

           In any event, the court found there was "evidence . . . that all the officers . . .

explained at the briefing that there was information that had been received from an informant that

[petitioner] was involved in a series . . . of robberies."  (RT 150.)  Finally, the court found that

petitioner had not demonstrated that the parole search was arbitrary and capricious and thus he

had no standing to object to the parole search of his person and car or the subsequent seizure of

the evidence found therein.  (RT 150.)  The court found petitioner was in possession of one

shotgun and in constructive possession of the other shotgun, both seized from the vehicle.  (RT

152.)

           Because petitioner was on searchable parole, any challenge that might have been

raised by defense counsel as to the jurisdiction of the officers in making the arrest and detaining

---

> When a public offense is committed in this State, . . . on a . . .  car [or] motor
> vehicle, . . . the jurisdiction is in any competent court, through, on, or over the
> jurisdictional territory of which the . . .  car [or] motor vehicle . . . passes in the
> course of its . . . trip, or in the jurisdictional territory of which the . . . trip
> terminates.

Cal. Penal Code § 783 (in pertinent part).

1  petitioner would have been futile.  And, because the San Joaquin County court had jurisdiction

2  over petitioner's charges, any motion to challenge that jurisdiction would have failed.  Petitioner

3  cannot demonstrate prejudice under <u>Strickland</u>, that is, had defense counsel brought these

4  motions, the motions would have been granted.

5  This is also true because the record reveals defense counsel was aware of the

6  possible jurisdictional and venue arguments:

7  MR. SCHULTZ:  . . . I have some concerns about the jurisdictional
   or venue issue of the stop in Modesto that I'm going to look into
8  overnight, Your Honor.

9  . . .

10  THE COURT:  Okay.  And if you have any other thoughts on the
   subject of the ex-con in possession, you let us know.

11  MR. SCHULTZ:  Yes, Your Honor.

12

13  (CT 225.)  Defense counsel did not raise those issues again.  It is clear from the record that

14  defense counsel was aware of the issues, yet decided not to pursue them.  "Tactical decisions that

15  are not objectively unreasonable do not constitute ineffective assistance of counsel."  <u>Hensley v.</u>

16  <u>Crist</u>, 67 F.3d 181, 185 (9th Cir. 1995).

17  The same reasoning applies to appellate counsel.  The <u>Strickland</u> standards apply

18  to appellate counsel as well.  Because this court finds no merit to the jurisdictional motions

19  petitioner alleges counsel should have raised, appellate counsel was not ineffective for failing to

20  raise them.

21  The state court's rejection of this ineffective assistance of counsel claim was

22  neither contrary to, nor an unreasonable application of, controlling principles of United States

23  Supreme Court precedent.  This claim should be denied.

24  ii.  <u>Plea Bargain Offers</u>

25  Petitioner contends defense counsel failed to properly advise petitioner regarding

26  plea bargain offers.  Petitioner argues that defense counsel failed to consult him regarding a plea

bargain offer of 50 years to life and of "30 years, plus weapons enhancements," (Pet. at 36-38); failed to advise him of the mandatory minimum or maximum sentence he would receive if convicted as charged; and erroneously advised him that the prosecutor would not try him "because the evidence seized in Modesto was seized illegally," (Pet. at 38) and a "new and more lenient offer would be forthcoming." (Id.)

There is no reasoned state court opinion addressing this claim.

The plea bargaining stage of a criminal proceeding is a critical stage in the criminal process at which a defendant is entitled to the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution. See Hill v. Lockhart, 474 U.S. 52 (1985); McMann v. Richardson, 397 U.S. 759 (1969). Counsel's duties to ensure defendants get a fair trial include "the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." Strickland, 466 U.S. at 688. A defendant has a constitutional right to participate in the making of certain decisions fundamental to his defense. Jones v. Barnes, 463 U.S. 745, 751 (1983). The decision to plead guilty is one such fundamental decision. Boykin v. Alabama, 395 U.S. 238, 242-44 (1969); Brookhart v. Janis, 384 U.S. 1, 7 (1966).

The record reflects the following. Prior to the April 5, 1999 hearing on the motion to suppress, the prosecutor informed the court he was authorized to offer petitioner a plea bargain of 50 years to life. (RT 2.) This was offered so petitioner would have an opportunity to parole in 42 years. (Id.) The offer would expire that day. (Id.) Defense counsel responded:

> MR. SCHULTZ: I want to respond.
>
> Since I and Mr. Villapudua spoke, I have discussed, as a matter of fact, the People's so-called offer with [petitioner]. And when I got this case – as I mentioned in chambers – I contacted Mr. Villapudua regarding some kind of rational resolution of this case.
>
> What they are asking from [petitioner], 50 years to life, is more than the average homicide defendant would receive and, you know,

1   proportionally, regardless of the numerous accusations against
[petitioner], he has never spilled a drop of blood that I'm aware of.
2   (RT 3.)

3           On September 29, 1999, prior to trial, defense counsel advised the trial court that

4   petitioner was "prepared to plead to all the counts, enhancements on the information in exchange

5   for a sentence of 30 years to life." (RT 238.)  However, the court informed petitioner and his

6   counsel that he was "not going to do that . . . unless the D.A. is willing to make a deal at this

7   point. . . ." (RT 240.)  The prosecutor responded that thirty years to life would be improper and

8   that the sentence "would have to run consecutive since the counts of felon in possession, not

9   charged in conjunction with the robbery count.  The. . . People would have to accept a plea which

10  would be much higher than 30 to life." (RT 240.)

11          On the first day of trial, October 9, 1999, the prosecutor offered a new plea

12  bargain, and the following took place outside the presence of the jury:

13          THE COURT:  Okay.  We are on the record now. . . .
Counsel have approached the Court and indicated that the district
14  attorney has an offer on the table, which apparently defense
attorney feels is the best – in the best interest of [petitioner] here.
15  Apparently the People have agreed to allow [petitioner] to plead
based upon a recommendation of, as I understand it, 30 years to
16  life, is that correct?

17          MR. SCHULTZ:  Yeah.  [Petitioner's] position is that he would
consider that if it was a fixed term.  I understand his position, I
18  don't believe the prosecutor's in a position to do that.

19          THE COURT:  Okay.  All right.  That's my understanding.
Now, [petitioner], this is your decision, of course.  You obviously
20  were here for your trial and at some point we are going to keep on
going with this and at some point you are going to pass the point of
21  no return, the D.A. probably isn't going to be interested in stopping
the trial, they want to go ahead and finish.
22
Your attorney, I'm sure, has explained this to you, but I just want
23  to make sure you understand what you are deciding to do, what you
are passing up, okay?
24
If you are convicted of all of these robberies, believe me, you will
25  never get out of prison.  Never.  The total – I haven't figured it out

26  /////

23

it's so big, something like two or 300 years to life.  And so that means that you wouldn't even be eligible for ever getting out on parole until you are dead, okay?

Now, the sentence that they are offering you, which is 30 years to life, it's no great gift by any means, but nevertheless you have a bad record.  I'm sure you realize that.  You've got a terrible record here.  And so if you are convicted of even one of these charges here, the likelihood is that you will get 30 years to life just on one charge.  It's 25 to life, plus whatever prison priors they have alleged here and weapons clauses.

So if you are convicted of one of these felonies and you have at least two strikes against you, I don't know whether those strikes are true yet either or not because they haven't submitted the evidence to me.  But you know better than I do whether or not you have these prior convictions.

If . . . it's true, you have at least two of these prior convictions and . . . you get convicted of them, even being an ex-con in possession, which apparently is the strongest charge against you, that's 25 years to life.  There is no quibble over that.  And probably 30 years to life because of the gun charge.

If you are convicted of one of the other counts, I forget how many counts there are here against you, 10 or something like that.  If you are convicted of even one of the robbery counts on top of being the ex-con in possession, that's 50 years to life.

Now, I want you to understand . . . the way the sentence works.  Now, the legislature has increased these sentences and made it the law.  There is no other way around it.  They have made them so high that there is just no wiggle room, even for the Court.  I have to do what the law tell me to do, just like you do.

If you get . . . two of these charges with the priors and you have to do 50 years to life, you are going to have to do 80 percent of that 50 years before you are even eligible for parole.  Now, I don't know what that works out to.  Let's just say it's 40 years.  I forget how old you are.

MR. VILLAPUDUA:  I believe he'd have to do the entire 50.

THE COURT:  Pardon me?

MR. VILLAPUDUA:  I believe he would have to do the entire 50.

MR. SCHULTZ:  That's right. . . . or the entire 30.  Besides, it wouldn't – it's a violent felony, it's 85 percent.

THE COURT:  85 percent.

1     MR. SCHULTZ:  On a three-strike sentence, they don't get any good time/work time.  About 18 months ago.

2

3     THE COURT:  Well, okay.  But . . . anyway, doesn't matter.  You are going to wind up doing at least 40 more years.

4     What is his age?  I've forgotten.

5     MR. VILLAPUDUA:  Thirty-two.  He's 33 on November 12th.

6     THE COURT:  So what it really amounts to is a life sentence.  Now –

7     MR. VILLAPUDUA:   Possibility of parole.

8     THE COURT:  The 30-year sentence at least gives you the hope that at some point you are going to get out before you die and have a few years left, you know, when you are an old man.

9

10    Now, it's your decision and if there was any hope that you were going to be acquitted on all of these charges, certainly, Mr. Schultz wouldn't be agreeing with this, because he is one of the most aggressive and last dog try the case, last dog is dead attorney in the public defender's office or in town, as far as that goes.  So nobody is going to give you a better defense than he is.

11

12

13

14    But, on the other hand, you know, you can't change fate.  If we have an earthquake tomorrow, nothing that any of us could do to stop it.  We can't prevent it from happening.

15

16    And that's basically I think what he's telling you here is that there is just – there's no hope.  If the cops caught you in possession of these shotguns, I can't imagine what you can do short of, you know, the Blessed Virgin Mary coming down from heaven to rescue you.  That's not going to happen here.

17

18

19    So it's your decision what you want to do.  You know, if you want to go ahead and let . . . this thing go through to the end and take your chances that maybe, you know, you'll get as good or better a deal, that's up to you.  But I just want to explain to you what the facts of life are here so that you know what you are deciding and you know why your attorney is recommending this to you.

20

21

22    Just in case you didn't believe him, maybe you'll believe me.  I don't know.

23

24    Now, it's up to you to decide what you want to do.  You talk to your attorney here and let him know what you want to do on the thing, okay?

25

26    /////

25

1   (RT 281-86.)  After a recess, defense counsel advised the court that the case was proceeding to

2   trial.  (RT 286.)

3           This record makes clear that petitioner was advised of the prosecution's first offer

4   of 50 years to life as well as the second offer of 30 years to life.  The trial judge was crystal clear

5   when informing petitioner he faced two to three hundred years to life if he went to trial and was

6   convicted of all the robberies alleged.  The trial judge was quite effective in painting the dim

7   chance petitioner faced if he did not take the plea offer and risked going to trial.  The record

8   demonstrates that defense counsel explained the plea offer to petitioner and recommended that he

9   take the plea offer.  The trial judge informed petitioner it was his decision whether or not to take

10  the plea offer and it is apparent that petitioner declined the plea offer against his counsel's

11  recommendation.

12          Petitioner's self-serving statements do not support the view that had defense

13  counsel somehow better informed him he would have taken the 30 years to life sentence.  The

14  record demonstrates otherwise.  Petitioner has presented no evidence to support his claim that

15  defense counsel advised him a better offer would be presented down the line.  The record does

16  not support such a claim.  Thus, petitioner has failed to demonstrate the prejudice prong of

17  Strickland, and this claim should also be denied.

18          iii.  Failure to Object or Appeal

19          Petitioner contends that both defense and appellate counsel were ineffective

20  because they failed to object to the charges and appeal convictions of conspiracy to commit

21  robbery.  Petitioner argues that because the overt acts charged in support of the conspiracy were

22  completed armed robberies, which were separately charged, the charged robberies cannot serve

23  as overt acts.  (Pet. at 24-27.)

24          There is no reasoned state court opinion addressing this claim.

25          A court need not determine whether counsel's performance was deficient before

26  examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

1  Strickland, 466 U.S. at 697.  Since it is necessary to prove prejudice, any deficiency that does

2  not result in prejudice must necessarily fail.  Ineffective assistance of counsel claims are analyzed

3  under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495,

4  (2000).  Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

5          Under California law, "[c]ommission of the target offense in furtherance of the

6  conspiracy satisfies the overt act requirement."  People v. Jurado, 38 Cal.4th 72, 121, 41

7  Cal.Rptr.3d 319 (2006), citing People v. Padilla, 11 Cal.4th 891, 966, 47 Cal.Rptr.2d 426 (1995),

8  overruled on other grounds, People v. Hill, 17 Cal.4th 800, 72 Cal.Rptr.2d 656 (1998).  The overt

9  act requirement may not be satisfied by conduct occurring after the target offense is complete.

10  People v. Zamora, 18 Cal.3d 538, 560 (1976).

11          Here, petitioner was charged with committing conspiracy to commit robbery "on

12  or about 12/28/98 and between 1/12/99" (CT 320) (Count 1).  He was charged with an additional

13  ten overt acts, the last six of which were originally charged in count 2, committed between

14  12/28/98 and 1/9/99.  (CT 320-21.)  Petitioner was charged with second degree robberies of an

15  AM/PM on or about 12/28/98 (counts 3 and 4), Taco Bell (count 6), and Circle K (count 7), on or

16  about 1/1/99; Pizza Hut (count 8) and Shell Mart (count 9) on or about 1/5/99; and KFC (count

17  10), Cheri Broadwax (count 11), and Michael's Pizza (count 12) on or about 1/8/99.  (CT 322-

18  30.)

19          The verdict form signed by the jury foreman demonstrates that the jury found

20  petitioner committed all of the charged second degree robberies (counts 3 through 12) in

21  furtherance of the conspiracy (CT 539), which satisfied the overt act requirement under

22  California law.  While the overt act requirement cannot be satisfied by conduct occurring after

23  the target offense is complete, People v. Zamora, 18 Cal.3d at 560, petitioner was not prejudiced

24  by the jury's consideration of post-offense overt act allegations because there was at least one

25  valid overt act to support the conspiracy verdict.  People v. Jurado, 38 Cal.4th at 121; People v.

26  Padilla, 11 Cal.4th at 965-66.

Contrary to petitioner's view, the jury was specifically instructed as to the definition of conspiracy and overt act (CT 429),[14] and that association alone does not prove membership in a conspiracy (CALJIC 6.13).  (CT 431.)  The jury was admonished that

> [e]vidence of the commission of an act which furthered the purpose of an alleged conspiracy is not, in itself, sufficient to prove that the person committing the act was a member of the alleged conspiracy.

(CT 432)(CALJIC 6.18).

> The formation and existence of a conspiracy may be inferred from all circumstances tending to show the common intent and may be proved in the same way as any other fact may be proved, either by direct testimony of the fact or by circumstantial evidence, or by both direct and circumstantial evidence.  It is not necessary to show a meeting of the alleged conspirators or the making of an express or formal agreement.

(CT 433)(CALJIC 6.12).  Finally, the jury was properly instructed as to the joint responsibility of co-conspirators.  (CT 434)(CALJIC 6.11).  The jury is presumed to have followed these

---

[14]  CALJIC 6.10:
A conspiracy is an agreement entered into between two or more persons with the specific intent to agree to commit the crime of robbery and with the further specific intent to commit that crime, followed by an overt act committed in this state by one [or more] of the parties for the purpose of accomplishing the object of the agreement. Conspiracy is a crime.

In order to find a defendant guilty of conspiracy, in addition to proof of the unlawful agreement and specific intent, there must be proof of the commission of at least one of the acts alleged in the information to be overt acts and that the act committed was an overt act. It is not necessary to the guilt of any particular defendant that defendant personally committed an overt act if [he] was one of the conspirators when the alleged overt act was committed].

The term "overt act" means any step taken or act committed by one [or more] of the conspirators which goes beyond mere planning or agreement to commit a crime and which step or act is done in furtherance of the accomplishment of the object of the conspiracy.

To be an "overt act", the step taken or act committed need not, in and of itself, constitute the crime or even an attempt to commit the crime which is the ultimate object of the conspiracy. Nor is it required that the step or act, in and of itself, be a criminal or an unlawful act.

Id.

instructions.  <u>Old Chief v. United States</u>, 519 U.S. 172, 196-97 (1997); <u>United States v. Reed</u>, 147 F.3d 1178, 1180 (9th Cir. 1998).

Because the record reflects that the jury was properly instructed on the issue of conspiracy and specifically found that petitioner was a co-conspirator, petitioner cannot demonstrate that but for defense counsel's failure to object to the charge of conspiracy, the outcome of this proceeding would have been different.  His claim against appellate counsel fails for the same reason.  Petitioner has failed to demonstrate that but for appellate counsel's failure to file an appeal on the conspiracy issue, his appeal would have been granted.  This claim should be denied.

iv.  <u>Jury Instruction</u>

Petitioner alleges defense counsel failed to request a jury instruction that Roger Mungle was an accessory after the fact and that his testimony required corroboration.  Petitioner also contends appellate counsel was ineffective for failing to raise this instructional error on appeal.  (Pet. 26-27.)

Respondent contends defense counsel was not ineffective because, even assuming Mungle was an accessory, his testimony did not require corroboration.  In addition, the trial court properly determined Mungle was not an accomplice as a matter of law.

There is no reasoned state court opinion addressing this claim.

Mungle testified as a prosecution rebuttal witness under a grant of use immunity.  (RT 1383, 1405, 1427-28; see RT 1443-45.)  Herman Garza, petitioner's nephew, testified against petitioner pursuant to a plea bargain that he would not be incarcerated beyond the age of 25.  ((RT 1060.)  Petitioner's sister, Lucile Lujan, testified against petitioner pursuant to a plea bargain where she would plead guilty to one count of robbery and the charges of four other robberies and a conspiracy to commit robbery would be dismissed.  (RT 1166-67, 1207, 1261.)  The trial court found Herman Garza and Lucile Lujan were accomplices as a matter of law.  (CT 418.)

1    In California, a conviction may not be based on the testimony of an accomplice

2   unless that testimony is independently corroborated by other evidence tending to connect the

3   defendant with the crime.  Cal. Penal Code § 1111.  An accomplice is someone "liable to

4   prosecution for the identical offense charged against the defendant on trial in the cause in which

5   the testimony of the accomplice is given."  Cal. Penal Code § 1111.

> In order to be an accomplice, the witness must be chargeable with
> the crime as a principal and not merely as an accessory after the
> fact.   An aider and abettor is chargeable as a principal, but his
> liability as such depends on whether he promotes, encourages, or
> assists the perpetrator and *shares* the perpetrator's criminal
> purpose.   It is not sufficient that he merely gives assistance with
> knowledge of the perpetrator's criminal purpose.

10   People v. Sully, 53 Cal.3d 1195, 1227, 283 Cal.Rptr. 144 (1991) (citations omitted); see People

11   v. Horton, 11 Cal.4th 1068, 1113, 47 Cal.Rptr.2d 516 (1995) ("[T]o be chargeable with the

12   identical offense, the witness must be considered a principal under [California Penal Code]

13   section 31.");  Cal. Penal Code § 31 ("All persons concerned in the commission of a crime,

14   whether it be felony or misdemeanor, and whether they directly commit the act constituting the

15   offense, or aid and abet in its commission . . . are principals in any crime so committed.").  "An

16   accomplice must have 'guilty knowledge and intent with regard to the commission of the crime.'

17   "  People v. Lewis, 26 Cal.4th 334, 369, 110 Cal.Rptr.2d 272 (2001).  Accomplice status is a

18   question of fact for the jury unless the evidence permits only a single inference.  People v.

19   Garrison, 47 Cal.3d 746, 765 P.2d 419 (1989).

20    Here, the trial court found Mungle was not an accomplice as a matter of law, and

21   properly instructed the jury that it must determine if Mungle was an accomplice, and, if so,

22   Mungle's testimony was subject to the same rules requiring corroboration as accomplice

23   testimony, and petitioner must prove by a preponderance of the evidence that Mungle was an

24   accomplice.  (CT 415-18 [CALJIC 3.10, 3.14, 3.16, & 3.19]; RT 1558-59.)  The record supports

25   the court's finding that Mungle was not an accomplice as a matter of law.

26   /////

1          Mungle testified that Herman Garza, a Norteno gang member, called and asked to

2   come to Mungle's house to borrow a gun because his cousin "was jumped by a group of Scraps

3   [Surenos], and he needed a gun to scare 'em." (RT 1384-85, 1388, 1409-14, 1419-20.) Mungle

4   told Herman he could use Mungle's father's 12-Guage Mossberg pump shotgun, and Herman

5   said he would come get it. (RT 1385, 1388.) Herman came by between 6 and 7 p.m., and

6   Mungle gave Herman the shotgun, wrapped in a blanket. (RT 1385-86, 1421.)

7          Mungle and his friend Steven Abujen drove in a gray van to Oak Park with

8   Herman, Manuel, petitioner (Herman's cousin), Herman's female cousin, and possibly another

9   person. (RT 1386-89 1415-18.) Herman had the shotgun. (RT 1387-88.) At the park,

10   petitioner, Herman and Manuel put on beanies, baseball hats, and sunglasses and bandanas over

11   their faces. (RT 1388, 1390-91, 1400, 1421.) They wore black sweatshirts and dark-colored

12   clothing. (RT 1390.) Mungle then "figured out what was going on" and that the shotgun was

13   going to be used in a robbery. (RT 1401, 1420.) Mungle remained in the van with Abujen and

14   the female cousin while petitioner, Herman and Manuel walked to the AM/PM store at Alpine

15   and California, with petitioner holding the shotgun in his pants leg. (RT 1388, 1390, 1391-92,

16   1400, 1401, 1420-21.)

17          Petitioner, Herman and Manuel returned to the van with two cases of beer, a

18   plastic AM/PM bag containing money, and the shotgun. (RT 1392-93.) All of them drove in the

19   van to an AM/PM at El Dorado and Hammer, but did not rob that location. (RT 1392-94, 1422.)

20   They then drove to the AM/PM near West Lane that was east and north of the AM/PM on

21   Hammer and El Dorado, and parked on the side of the street around the corner about a block

22   north of the store. (RT 1394-96, 1423.)

23          Petitioner, Herman and Manuel got out of the van, disguised themselves, grabbed

24   the shotgun, and walked to the AM/PM. (RT 1394-98, 1423.) A few minutes later they returned

25   with a small bag containing money; petitioner carried the shotgun. (RT 1398-99.) Petitioner

26   gave Mungle $50.00. (RT 1400, 1423.) They drove back to Mungle's house, where he put the

1   shotgun back in his father's closet.  (RT 1399-1400.)  Petitioner, Herman, Manuel and the female

2   cousin left.  (RT 1400.)  After Michael's Pizza was robbed, Herman telephoned Mungle and

3   admitted robbing the pizzeria.  (RT 1401, 1425.)

4          Mungle denied participating in any of the robberies.  (RT 1403.)  He believed that

5   Herman was borrowing the shotgun to scare the Surenos by firing one shot in the air.  (RT 1411-

6   13, 1418.)  He did not supply any ammunition for the shotgun.  (RT 1412.)  He hoped that, in

7   exchange for his cooperation he would receive leniency for any consequences arising from the

8   two robberies committed.  (RT 1430.)

9          Mere knowledge of a crime and presence at the scene is insufficient to establish

10  that a witness is an accomplice because "this fact without more merely means that [the

11  individual] was an eyewitness and not necessarily an accomplice to the crimes."  People v.

12  Lewis, 26 Cal.4th at 369.

13         Although petitioner argues that Mungle's affirmative response to defense

14  counsel's question, "you are now aware, are you not, that knowingly furnishing a firearm to be

15  used in a robbery is a crime in and of itself?" demonstrates Mungle was an accessory.  But this

16  would be an accessory before the fact, not after, as the crime occurred after Mungle loaned the

17  shotgun.  In California, an accessory before the fact is the same as an accomplice, which the jury

18  found Mungle was not, because he had loaned the unloaded shotgun to scare a gang member, not

19  to be used in a robbery.  Moreover, an accessory is not liable for the identical offense, and

20  therefore is not an accomplice.  See People v. Snyder, 112 Cal.App.4th 1200, 1220, 5

21  Cal.Rptr.3d 711 (2003) ("A mere accessory is not liable as an accomplice, and a court is not

22  obligated to give an accomplice instruction when the evidence establishes that the witness was

23  merely an accessory.") (internal citation omitted).

24         For all of the above reasons, petitioner has failed to demonstrate prejudice under

25  Strickland, and this claim must also fail.  His claim against appellate counsel fails for the same

26  reason.  Because the trial court was not required to give an instruction even when the evidence

1  demonstrates the witness is an accessory, <u>Snyder</u> at 1220, petitioner cannot demonstrate that but

2  for appellate counsel's failure to challenge the absence of such an accessory instruction the

3  appeal would have been granted.  This claim should also be denied.

4                  v.  <u>Failure to Properly Present and Argue the Suppression Motion</u>

5          In this claim, which petitioner separately identified as claim G, he revisits his

6  arguments contained in his first ineffective assistance of counsel claim.  He expands the claim a

7  bit to argue that defense counsel did not properly argue the suppression motion, although his

8  focus is again on the jurisdictional issues argued above.  Respondent did not address this claim,

9  presumably because it is largely redundant of the first ineffective assistance of counsel claim.

10          There is a reasoned state opinion, however, addressing petitioner's claim that

11  defense counsel somehow mishandled the motion to suppress.  <u>In the Matter of the Petition of</u>

12  <u>Miguel Garza</u>, Case No. SF 075743 (March 17, 2003) (appended to petitioner's First Amended

13  Petition.)  In that state court petition, petitioner also contended there was no probable cause to

14  seize the items of property taken from the car petitioner was driving.  The state court addressed

15  the claim as follows:

16           The court has reviewed the transcript of the motion to suppress.  At
the hearing of the motion, petitioner's attorney made it clear the

17           motion to suppress was based both on whether the detention and
search were justified and upon whether the items seized by the

18           police were subject to seizure.  Although the court noted that
petitioner's motion did not expressly indicate the motion was based

19           on the second, as well as the first ground, the court permitted
petitioner to proceed with the motion on both theories.  The court

20           denied the motion on three separate grounds.  The court found, in
view of petitioner's status as a parolee, he had no expectation of

21           privacy in any of the items taken from the vehicle and, therefore,
no standing to object to their seizure.  The court also considered

22           the fact that the motion failed to comply with San Joaquin County
Superior Court Local Rule 2-102.1(b) in that it failed to identify

23           the specific legal and factual basis for the motion to suppress.
Finally, the court indicated, even if it had not denied, or erred in

24           denying, the motion on those grounds, it also denied the motion on
the ground there was probable cause to seize the items taken from

25           the vehicle.

26  /////

> The motion to suppress was heard on all grounds and denied on its merits.  Therefore the failure to petitioner's attorney to comply with the procedural requirement established by Rule 2-102.1(b) resulted in no prejudice to petitioner.

In the Matter of the Petition of Miguel Garza, Case No. SF 075743, at 1-2.

Petitioner contends that defense counsel "did not argue with any passion that his client (petitioner) had been literally kidnaped from Stanislaus County back into San Joaquin by agents that lacked any authority."  (Pet. at 28.)  This claim is redundant of his jurisdictional claim raised earlier.  To the extent petitioner contends defense counsel failed to properly present and argue the suppression motion, petitioner has failed to present any factual allegations, other than his jurisdictional challenge addressed above, to support this claim.  See Blackledge v. Allison, 431 U.S. 63, 74 (1977) ("presentation of conclusory allegations unsupported by specifics is subject to summary dismissal"); Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) ("'[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief'") (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)).  In this regard, petitioner has failed to demonstrate either substandard performance by counsel or prejudice.  Accordingly, he is not entitled to relief on this claim.

vi.  Evidence re Petitioner's Limp

Petitioner contends defense counsel failed to investigate and develop available evidence demonstrating that petitioner walks with a limp.  Petitioner argues defense counsel should have obtained a medical expert to testify that petitioner limped as a result of a gunshot wound to his ankle while he was in prison in 1991, and that the limp, unobserved by witnesses to the robberies herein, demonstrated petitioner was unable to participate in those robberies.

The last reasoned state court opinion addressing this claim was the San Joaquin County Superior Court in In the Matter of the Petition of Miguel Garza, Case No. SF 075743 (March 17, 2003) (appended to petitioner's First Amended Petition.)

/////

1    Petitioner also contends he received ineffective assistance of
     counsel during trial in that his attorney failed to present medical
2    records and expert witness testimony to establish petitioner limped
     due to a gun shot wound he sustained to his ankle while in prison
3    in 1991.  Petitioner contends the fact he limps was relevant, as
     none of the victims of the robberies indicated any of the robbers
4    limped.  Although petitioner's trial attorney did not offer any
     medical records or expert opinion evidence as to petitioner's old
5    wound, at least two witnesses testified petitioner walks with a
     limp, petitioner was allowed to exhibit his wound to the jury, and
6    presumably, the jury had some opportunity to view petitioner walk
     during the course of the trial.  The failure of petitioner's trial
7    attorney to offer medical records or expert opinion regarding
     petitioner's old wound did not constitute inadequate assistance of
8    counsel.

9    Id. at 3.

10          The record reflects that evidence of petitioner's limp was admitted.  During the

11   cross-examination of Herman Garza, defense counsel asked about the limp:

12          Q.  Is your Uncle Miguel [petitioner] incapacitated in any way?

13          A.  What's that?

14          Q.  There anything physically wrong with him that you know of?

15          A.  Something's wrong with his ankle.

16          Q.  All right.  Is that noticeable in some way?

17          A.  Yeah.

18          Q.  How does it manifest itself?  I mean, how does it show itself?

19          A.  Because he walks the way he walks.

20          Q.  And does he walk different than other people?

21          A.  Yeah.

22          Q.  Could you describe that difference?  Is it a limp?

23          A.  Yeah, just a limp.

24   (RT 1121-22.)

25          Lucile Lujan, petitioner's sister, testified that petitioner walks with a limp and

26   wears special shoes for his left ankle as a result of the gunshot wound.  (RT 1347-48, 1350.)

1   At that time, defense counsel pointed out the injury on petitioner's ankle:  a "scar that runs

2   approximately . . . four inches down the outside of his left ankle over the bump. . . . On the other

3   side there's also some scarring in kind of a curved shape that is . . . lateral epicondyle . . . .  And

4   down to the beginning of his instep on the inside."  (RT 1381-82.)

5          Although petitioner characterized defense counsel's description of his injury as a

6   "bump," that characterization is not supported by the record.

7          Moreover, petitioner has presented no expert declaration supporting his theory

8   that had such an expert been consulted, he or she would have opined that petitioner could not

9   have been involved in any of the robberies because of his limp.  Although none of the victims

10  testified they witnessed petitioner limping, it is likely their focus at the time was on the shotgun

11  rather than how any of the perpetrators walked.

12         In addition, there was testimony refuting petitioner walked with a limp.  Stockton

13  Police Officer Robert MacDonald testified that he observed petitioner walk during his arrest, as

14  well as every day he was in court during the two prior weeks of trial, and he did not observe

15  petitioner walk with a limp.  (RT 1433.)  Roger Mungle also testified that he did not notice

16  anything unusual about the way any of the robbers walked after the first AM/PM robbery on

17  December 28, 1998.  (RT 1400.)  Indeed, Mungle testified that he saw petitioner, Herman and

18  Manuel run halfway through Oak Park and then walk toward the van.[15]  (RT 1400.)

19         The state superior court properly applied Strickland to find defense counsel was

20  not ineffective for failing to offer medical records or expert opinion regarding petitioner's old

21  wound.  The state court's rejection of this claim was not contrary to nor an unreasonable

22  application of clearly established Supreme Court precedent, and this claim should be denied.

23

24        [15]  Mungle also testified that petitioner carried a bag of money and the shotgun.  (RT
     1392-93.)  Store cashier Jenna Lee Horton testified that a man with a shotgun pointed it at her
25   and ordered her to put the money from one of the cash registers into a clear bag.  (RT 271-74.)
     He grabbed a $20 bill which a store customer had placed on the counter.  (RT 276.)  When two
26   voices by the front door said "Come on, let's go," the man ran across the parking lot and into the
     park.  (RT 273-74.)

1    For all of the above reasons, this court cannot find that trial counsel's performance

2 fell outside "the wide range of professionally competent assistance" that the Sixth Amendment

3 requires, and petitioner's ineffective assistance of counsel claims should be denied *in toto*.

4    C.  Three Strikes Law

5    Finally, petitioner contends that the Three Strikes law violates "substantive due

6 process and equal protection by failing the 'rationality' test applied to legislation, Fourteenth

7 Amendment to the federal Constitution, California Constitution Article I, §§ 7 and 15."  (Pet. at

8 46-53.)

9    The California Supreme Court denied this claim, citing In re Clark, 5 Cal.4th 750

10 (1993) and In re Robbins, 18 Cal.4th 770, 780 (1998).  (Pet. at 30.)

11    The California Court of Appeal addressed this claim as follows:

12    [Petitioner] challenges the three strikes law on both due process
and equal protection grounds.  He argues the law is not rational

13 because, among other things, it makes arbitrary distinctions
between offenders and may lead to cruel and unusual punishment

14 under certain circumstances.  [Petitioner] particularly takes issue
with the fact the law treats offenders differently, depending on the

15 order in which offenses are committed.

16    [Petitioner] recognizes these arguments have been rejected in
several Court of Appeal decisions, including one by this court.

17 (See *People v Cooper* (1996) 43 CalApp.4th 815, 828-830; *People
v. Kilborn* (1996) 41 Cal.App.4th 1325, 1329-1332; *People v. Sipe*

18 (1995) 36 Cal.App.4th 468, 482-483.)  He nevertheless argues
those decisions were decided wrongly.  [The court] disagree[s].

19 [Petitioner's] equal protection argument fails because a third-strike
offender is not similarly situated with other offenders, even those

20 who have committed the same offenses in a different order.

21    As to due process, [petitioner's] challenge goes more to the
wisdom of the legislation than its rationality.  However, "[i]t is not

22 the function of the courts to decide whether the Legislature
properly weighed the evidence offered by proponents and

23 opponents of a law, or whether it selected the 'correct' remedy for
a given problem."  (*Buhl v. Hannigan* (1993) 16 Cal.App.4th 1612,

24 16231.)  Whether a law is "wise" is a matter of public policy for
the Legislature, not the courts.  (*Ibid.*)  The three strikes law is

25 "reasonably related to a proper legislative goal" of curbing

26 /////

1    recidivist criminal activity.  As such, it does not violate due
2    process.  (See *Hale v. Morgan* (1978) 22 Cal.3d 388, 398.)

3    People v. Garza, slip op. at 9-10.

4          To establish a violation of the Fourteenth Amendment's equal protection clause, a

5    person challenging a statute must identify a similarly situated class that was treated differently.

6    See Freeman v. City of Santa Ana, 68 F.3d 1180, 1187 (9th Cir. 1995).  Unless the alleged

7    discrimination involves a suspect class of persons or a fundamental right, a challenged statute

8    satisfies equal protection if it bears a rational basis to a legitimate governmental interest.  See

9    United States v. Klein, 860 F.2d 1489 (9th Cir. 1988), overruled on other grounds by United

10   States v. Nordby, 2000 WL 1277211 (9th Cir. 2000).

11         Despite petitioner's argument that the order of crimes committed can result in

12   unequal punishment under California's Three Strikes Law, repeat offenders are a special class of

13   criminals, and courts have found a rational basis for punishing them more harshly than non-

14   repeat offenders.  See Solem v. Helm, 463 U.S. 277, 296 (1983) ("[A] State is justified in

15   punishing a recidivist more severely than it punishes a first offender.");  Rummel v. Estelle, 445

16   U.S. 263, 284 (1980) (purpose of a recidivist statute is to deter repeat offenders and, at some

17   point in the life of a particular repeat offender, to segregate him from society for an extended

18   period); United States v. Kaluna, 192 F.3d 1188, 1199 (9th Cir. 1990) (holding that a federal

19   three-strikes law does not impose cruel and unusual punishment, in part because legislatures may

20   punish repeat offenders more severely than first-time offenders).  Due process requires only that

21   a sentencing scheme be rational.  See Chapman v. United States, 500 U.S. 453, 465 (1991).  The

22   United States Supreme Court has found California's Three Strikes Law to be rationally related to

23   legitimate government interests.  Ewing v. California, 538 U.S. 11 (2003)(holding that a sentence

24   of 25 years to life imposed for felony grand theft under California's three-strikes law did not

25   violate the Eighth Amendment).  "Outside the context of capital punishment, successful

26   /////

1  challenges to the proportionality of particular sentences have been exceedingly rare." <u>Rummel</u>,

2  445 U.S. at 272.

3         In light of the above binding Supreme Court authority, the state court's rejection

4  of this claim was not contrary to nor an unreasonable application of clearly established Supreme

5  Court precedent.

6         In accordance with the above, IT IS HEREBY RECOMMENDED that

7  petitioner's application for writ of habeas corpus be denied.

8         These findings and recommendations are submitted to the United States District

9  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

10  days after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

13  failure to file objections within the specified time may waive the right to appeal the District

14  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

15  DATED:  August 26, 2009.

16

17                              UNITED STATES MAGISTRATE JUDGE

18

19  /001;garza625.157

20

21

22

23

24

25

26